# Peoples' Bank *versus* Gayley.

1. A warehouse receipt, as contemplated by the Act of September 24th 1866, must be issued by the person in possession of the goods in his own right. One who is the servant or agent of the principal cannot issue such receipt.

2. Where goods on storage are pledged without the knowledge of the bailee, and the latter, by direction of the pledgor, subsequently delivers the goods to a bona fide purchaser for value, the pledgee cannot maintain replevin against the bailee.

3. E. was a warehouseman and lessee of a wharf. G. was employed to take charge of the wharf. F. obtained a receipt from G., showing that G. had received and held subject to F.'s order certain iron. F. pledged the iron to a bank as collateral for a loan, endorsing the receipt to the bank. The latter never notified G. or his employer. F. afterwards obtained another receipt from E. without disclosing that he had obtained a receipt from G., and sold the iron to H., to whom E. gave a new receipt in his own name. F. becoming insolvent, and the bank failing to get the iron from G., brought replevin against him. *Held*, that it could not recover.

January 23d 1880.    Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ.    GREEN, J., absent.

Error to the Court of Common Pleas, No. 1, of *Philadelphia county :* Of January Term 1878, No. 226.

Replevin by the Peoples' Bank of Philadelphia, against Andrew T. Gayley for eight hundred tons of iron.

At the trial it appeared that in October 1874 there was stored on the Callowhill street wharf eight hundred tons of iron. De-

fendant was in charge of this wharf, but there was no sign about it to indicate who was its owner. The iron belonged to the firm of Malin Bros., and on the above day Alexander Ervin, a confidential agent and attorney of Henry G. Morris, an iron manufacturer, went to the defendant at the wharf with an order from the Malin Bros. to deliver to said Morris three hundred tons of this iron. The order was in an envelope with a printed address in these words: "A. T. Gayley, Esq., Callowhill street wharf, Delaware avenue, city." Ervin told Gayley he wanted to borrow money on the iron from plaintiffs, and that he had negotiated a loan on it for Morris, and that he desired from defendant a warehouse receipt to use for that purpose.

Gayley wrote the following receipt:

"Philadelphia, October 15th 1874.
Received from Malin Bros. three hundred tons (300) * 1 Nth Penn. pig iron on storage, subject to the order of Henry G. Morris.
AND. T. GAYLEY."

Ervin turned this document, and in Gayley's presence Ervin wrote on the back the following words:

A. T. GAYLEY, Esq.,
Please deliver enclosed pig iron to W. H. Taber, Esq., Cash or order.
HENRY G. MORRIS,
p p ALEX. ERVIN,
Atty.

October 20th 1874, Gayley issued a second receipt in these words:

Philadelphia, October 20th 1874.
Received from Malin Bros.:
　　250 tons, * 1 Nth Penn. pig iron.
　　250　"　* 2 x Robbins　"
Held subject to the order of Henry G. Morris.
AND. T. GAYLEY.

And in the same manner Ervin endorsed said receipt in Gayley's presence thus:

Please deliver enclosed pig iron to W. H. Taber, or order.
HENRY G. MORRIS,
p p ALEX. ERVIN,
October 20, 1874.　　　　　　　　　　　　　　　Atty.

William H. Taber was the cashier of the plaintiffs. Both the receipts thus endorsed were taken to the Peoples' Bank with the printed envelope above mentioned, and $18,500 was loaned upon this iron. This was October 15th and 20th 1874.

The original note given by Morris to the bank was renewed, the

same iron continuing as collateral until May 1875, when Morris failed. The loan not being paid, the plaintiff laid claim to the iron included in these receipts. They offered to pay the storage and demanded the iron, but Gayley gave them no satisfaction, and referred them to one Etting as the owner of the wharf. The bank then issued this writ of replevin for the eight hundred tons of iron. The return of the sheriff showed six hundred and fifty-three tons replevied, and one hundred and forty-seven tons eloigned by Gayley. It was not denied that Ervin had authority to act for Morris.

The defence was that after the pledge of the iron to the plaintiffs, February 27th 1875, Ervin, as Morris's agent, gave George M. Troutman a bill of sale for the iron, and that the receipts of Gayley were merely memoranda given by him as the weighmaster of Etting. The evidence in this direction comprised the following offers to prove, 1. That defendant was the clerk or assistant of E. J. Etting; 2. That Etting was a warehouseman; 3. That the wharf was Etting's wharf, held under a lease, on which he received goods for storage and warehousing; 4. That warehouse receipts for goods stored on that wharf were issued by Etting or his partner only; 5. That defendant had no authority to issue warehouse receipts; 6. That he had never done so to his knowledge or intention; 7. That the papers produced by plaintiff were obtained from him by Ervin to enable him to have a written memorandum of the fact that the iron bought from Malin by Morris was actually on that wharf; 8. That at the time of giving those receipts defendant told Ervin that he could not give him a warehouse receipt, and if he wanted one he must go to Mr. Etting, who alone could give that; 9. That it was untrue that Ervin told witness, defendant, that he intended to pledge the iron to plaintiffs; 10. That it was untrue that Ervin made the endorsements on the receipts in his presence or to his knowledge; 11. That defendant never heard of the pledge to the plaintiffs until June 1875, or thereabouts; 12. That in the meantime the iron was sold by Morris to Troutman in February for value paid, and was delivered to him; 13. That before the writ issued, or there was notice of the title of the plaintiffs by either Etting, Gayley or Troutman, Etting, the warehouseman, agreed to hold the iron for Troutman, and issue to him a warehouse receipt; 15. That it was the practice, when application was made to Mr. Etting for a warehouse receipt, for Mr. Etting to ascertain what amount of the iron was there, and having issued a warehouse receipt, he notified Mr. Gayley, in order that he might know the iron could no longer be delivered on the order of the depositor.

All of these offers were severally objected to, and the objections overruled.

It was then proved by defendant, Etting, Morris and others, that Morris, at various times had kept iron stored on the wharf,

and that Ervin was familiar with the method of issuing warehouse receipts for it. Morris also testified, " I knew Gayley as a weighmaster ; did not know him as a warehouseman."

After Ervin had obtained the above receipts on November 18th 1874, he applied to Etting & Groome for another receipt for the same iron. They knew nothing of the receipts previously issued, and upon this application they issued their usual warehouse receipt as follows :—

" Storehouse, Callowhill street wharf, Delaware Avenue,
Philadelphia, November 18th 1877.

Received from Henry G. Morris, the merchandise described below, to be held by me on monthly storage, from November 18th 1874, and to be delivered on the order of The Philadelphia Warehouse Company, only on the return of this certificate and payment of the charges.

| Marks, &c. | Description of Merchandise. |
|---|---|
| 670 tons. | Six hundred and seventy tons No. 1 Pig iron, |
| 340 " | Three hundred and forty tons No. 2 x pig iron, |
| 140 " | One hundred and forty tons No. 2 common pig iron. |
| 1150 tons. | Delivered to Henry G. Morris, on payment of charges. |

Charges :                    W. H. JACKSON,
Storage per month, 10 cents.              for Company.
Labor,

(Endorsed).

Warehouse receipt. H. G. Morris; date —— 1874. Merchandise. Philadelphia warehouse; cancelled receipt; order to deliver. Please deliver the within merchandise upon payment of all charges."

On the back of this receipt were printed "obligations of warehousemen and storekeepers," and underneath the full text of the Act of September 24th 1866, Purd. Dig. 114, relating to goods, wares and merchandise in store, &c.

The same firm issued a similar receipt for 120 tons on November 25th 1874. Both these receipts were delivered to the Philadelphia Warehouse Company as collateral for a previous loan made by that company to Morris. In February 1875, one Troutman purchased this iron from Morris under an agreement to pay off the loans for which it was held as collateral. This he did, and thereupon he received a bill of sale from Ervin, and obtained from Etting & Groome a warehouse receipt in his own name for the iron.

Defendant offered in evidence the two receipts above-mentioned, dated November 18th and November 25th, respectively, from Etting to the Philadelphia Warehouse Company, and also a letter

from Etting to defendant, dated November 23d 1874, giving notice of the issue of the certificate for the iron. Objected to and objection overruled.

The plaintiffs submitted the following points, to which are appended the answers of the court:—

First. That the papers in evidence, signed A. T. Gayley, and dated October 15th and 20th 1874, vested in plaintiffs on delivery, the title to the property therein described."

Ans. "Well, that is so."

Second. Said papers are receipts within the meaning and purview of the Act of Assembly, entitled, &c., being the Warehouse Act.

Ans. "That, I think, is not the case. I say that they are not receipts within the meaning and purview of that law."

Third. Said papers are negotiable under said act.

Ans. "I do not think that they are."

4th. Said papers, whether negotiable or otherwise, vested in plaintiffs a valid title to said property against Gayley and Morris.

Ans. "Well, that would be so."

5th. The title of the plaintiffs being good against Gayley and Morris, it continued, and continues good against all persons whomsoever, unless divested, "apart from legal process," as a consequence of some illegal act of plaintiffs, or by reason of some unlawful act of commission or omission of plaintiffs.

Ans. "I do not think, as I have said to you, that that is so, if subsequently to that they failed to give notice of their having this pledge to this property, and if it was in good faith transferred to another by a warehouse receipt, that would divest their property."

6th. The issue of a warehouse receipt by Etting cannot, *per se*, divest the title of plaintiffs, or give title to any one against plaintiffs.

Ans. "If the warehouse receipt was issued in good faith, it would have that effect."

7th. Under the evidence in the cause, the issue of a warehouse receipt to Troutman, or any other person, could not divest the title of plaintiffs.

Ans. "I say that it could."

9th. The alleged title of Troutman, given in evidence, is no defence under the pleas of *non cepit, non detinet,* and no property in plaintiffs.

Ans. "I think that it is."

The defendants presented the following points, to which are appended the answers of the court:

2d. The documents in question are not warehouse receipts.

Ans. "In my opinion they are not."

3d. The plaintiffs, to entitle them to claim under those papers as warehouse receipts, must prove that Gayley was a warehousman,

[Peoples' Bank *v.* Gayley.]

and as such intrusted with the iron. Not having done this, they cannot assert title to the iron by the endorsement and delivery of the receipts.

Ans. " That, as a matter of law, I instruct you to be so."

6th. Unless the plaintiffs had under its title as pledgee a right to the possession of the iron, at the date of his writ, June 18th 1875, he is not entitled to recover in this suit, which is a replevin for these goods.

Ans. "That is so."

7th. If Mr. Morris, the owner of the iron, subsequent to the pledge of the plaintiffs, sold the iron to Troutman, and Etting agreed to hold the iron for Troutman, that was a delivery to Troutman, equivalent to an actual delivery and removal of the same by him.

Ans. " That is so."

8th. If the wharf on which the iron was, and is still stored, was the wharf of Etting, and the defendant, Gayley, was merely his servant, and the iron was subsequently sold by Morris to Troutman, and Etting issued to him a warehouse receipt, and Troutman was a bona fide purchaser for value without notice of the prior pledge by Morris to the bank, then the title of the bank was divested by that sale and delivery to Troutman, and the plaintiff cannot recover.

Ans. " That I think to be so."

9th. If the jury should find that Gayley had notice of the pledge to the bank, the plaintiffs cannot recover in this action, if Troutman bought the iron after that pledge, and without notice of the pledge paid for it. For the plaintiffs' right depends on title, and that was divested by the sale to Troutman bona fide, and for value without notice.

Ans. " I affirm this point."

In the general charge the court, Biddle, J., inter alia, said: " The bank alleges they hold what is called a warehouse or storage receipt, issued by Mr. Gayley to Mr. Morris, and that under our Act of Assembly this receipt is negotiable, and having come to them by assignment, the title of the property of Mr. Morris is in them.

"Well, then, if these are warehouse receipts that is undoubtedly true; but are these warehouse receipts? [Before any one can issue warehouse receipts, he must be in possession of the property, that is, not simply in charge of the property.] If this were not the law, we could carry on no business with any safety, unless we could perform all the duties connected with it ourselves. The porter of your store, before you got down there in the morning, the watchman of the bank, the servants of your house, could give a valid title to all your property. [In the case I put, and which I do not think the danger of has been explained away, coal is sent

to you by your coal merchant, whoever he is, the receipts are given by anybody, any member of your family who happens to be there, for one or two, or ten tons of coal; your servant, or your cook, or your wife, writes the name to that. Well, can it be possible, that when that goes back to your coal merchant, that he can assign that, as if you had admitted that you had had that much coal of his in your cellar, and that the man then could sue you or your cook, and when your cook came in, say for you, why I have acknowledged you have got this coal.]

"Her answer would be, probably, "I am cook of this house; the man came to the house, and he put this coal down in the cellar, and he says, 'Now I want you to give me a memorandum that I have left that here to show when I get home,' and the cook then hands him this memorandum; and then if the coal merchant transfers it to somebody else, why then the cook's lawyer would come here, and would say, 'Why you don't mean to say that you want to hold this woman responsible; this is not a warehouse receipt that is negotiable, for you cannot assign this; admitting that this act was done, and the coal was put down in the cellar, this is not a warehouse receipt under the law, and is not assignable;' and that, in fact, is exactly what is stated here in the present case. * * * [As my opinion is, this man had no such possession of this wharf, under the evidence, as would justify him to give what the law declares to be a warehouse receipt."]

The verdict was for defendant, and after judgment thereon, plaintiffs took this writ, and alleged that the court erred in the admission of the testimony under the above offers, in the answers to points, and in the portions of the charge included in brackets.

*F. C. Brewster* and *Charles Gilpin* for plaintiffs in error.—The law will not allow this defendant, after holding himself out to the world as a warehouseman, after issuing receipts as a warehouseman, which came into the possession of the plaintiffs for a valuable consideration, to set up to the prejudice of the plaintiffs that he was merely a servant, and had no authority to issue receipts. The defendant being a warehouseman is estopped as against one who takes the warehouse receipt for a valuable consideration, from denying the truth of the statements to which it gives credit by its signature, so far as those statements relate to matters which are, or ought to be, within his knowledge, or the knowledge of his agent: Hale *v.* Milwaukee Dock Co., 29 Wis. 482. The receipt was not signed by Gayley as agent. He had the power to receipt and deliver. Under the pleas of *non cepit* and no property, Gayley wanted to prove that he was not principal, but agent.

The assignment of the receipts was equivalent to the delivering of the property itself: Hanson *v.* Myers, 2 Tudor's Leading Cases 626; Gibson *v.* Stevens, 8 Howard 398; Dows *v.* The Nat.

[Peoples' Bank v. Gayley.]

Ex. Bank, 1 Otto 618; Sheppard v. Harrison, 5 H. L. R. 120; Enlow v. Klein, 29 P. F. Smith 488; Bank v. Jones, 4 Comstock 498; First Nat. Bank v. Dearborn, 136 Mass. 219; City Bank v. Railroad Co. 44 N. Y. 300; Alderman v. Railroad Co., 115 Mass. 234; Dows v. Rush, 28 Barb. 158; Schumacher v. Eby, 12 Harris 525; Millar v. Savings Institution, 3 W. N. C. 480. It was clearly error to allow defendant to show a pledge of the same iron by Ervin after a pledge to the plaintiffs. If Gayley exceeded his powers as an agent, his principal cannot deny his authority. A receipt for the price of goods given by an agent or a consignor is a receipt by his employer, so as to enable the consignor to maintain an action for money had and received against the consignee: Comly v. McBride, 4 Whart. 526.

Suppose that, secretly, Gayley had no power to give receipts, still it is clear, independently of the foregoing authorities, that his vouchers bind his employers, and therefore, the receipts held by the plaintiffs are as valid and binding, as if actually issued by the employers, for they placed him in the position to do wrong and to mislead: Griswold v. Haven, 11 Smith (N. Y.) 598. The plaintiffs became the owners of the iron in October 1874. If so their title never having been divested by their own act or by judicial process, Troutman's title, set up by the defendant, must fall: Quinn v. Davis, 28 P F. Smith 18; McMahon v. Sloan, 2 Jones 229; Davis v. Bigler, 12 P. F. Smith 247; Corst v. Kleber, 29 Id. 290; Second National Bank v. Walbridge, 19 Ohio 419; Martin v. Creditors, 14 La. Ann. 393.

Nor can it avail the defendant to assert that the plaintiffs should have notified Etting or Groome of the pledge of the iron. The answer to this is self-evident. The plaintiffs had no knowledge of Groome or Etting, or that defendant, who acted as principal, was a servant. Besides this, the notice to defendant was in law notice to his employers.

*W. Wynne Wister, Jr.*, and *R. C. McMurtrie*, for defendant in error.—The plaintiffs had no right to the possession at the time the action was commenced and cannot maintain an action of replevin: Collins v. Evans, 15 Pick. 63; Leslie v McDowell, 6 Harris 91; Reinheimer v. Hemingway, 11 Casey 438; Rogers v. Arnold, 12 Wend. 30; Sanley v. Neale, 98 Mass. 343; Parker v. Mellor, 1 Ld. Raym. 219; Clemson v. Davidson, 4 Binn. 409; Miller v. Adsit, 16 Wend. 344; Rockwell v. Saunders, 19 Barb. 473; Pierce v. Stevens, 30 Maine 184.

The ownership of the plaintiffs, the very foundation of their action, was, in its origin, a simple pledge as security for a loan, and it was never anything more. It was a pledge without possession, and the pledgor and owner of the iron, after the pledge, actually sold and delivered the iron, the subject of the pledge, to

a bona fide purchaser without notice of the pledge. Now, if the sale and delivery by the owner of the iron destroyed the ownership of the pledgee without possession, the right of that pledgee to maintain replevin is gone: Pierce *v.* Stevens, *supra;* Warner *v.* Matthews, 18 Ill. 83; Curd *v.* Wunder, 5 Ohio 92; Boyle *v.* Rankin, 10 Harris 168; Shaw *v.* Levy, 17 S. & R. 99; Winslow, Lanier & Co. *v.* Leonard, 12 Harris 14; Davis *v.* Bigler, 12 P. F. Smith 242.

A warehouse receipt, is a document of statutory origin, as to all questions that arise in this case, and it is of the last importance to have a correct construction of the statute and the effect to be given to it in this the first case on the subject. The statutory regulations have no other object than to give a quasi negotiable character to such documents and to regulate the consequences. These consequences must be looked at in considering it. They are very extensive in their nature. They introduce an entirely new principle into our law, and one that cannot be too carefully reflected upon. No rule has been more sedulously guarded than that there shall be *actual* change of possession to effectually protect subsequent purchasers of personal property from frauds: Shaw *v.* Levy, 17 S. & R. 99; Hazard *v.* Hamlin, 5 Watts 201; McKibbin *v.* Martin, 14 P. F. Smith 352. For this change of possession is now substituted a document signed by the party in whose possession the property is, the effect of which is to be equal to an actual delivery.

One of the first essentials to a warehouse receipt is, that it should be issued by a warehouseman, and that the goods for which it is given, should be on the premises of such warehouseman. It seems to result from the very effect given by the statute to such a paper, that it should only be issued by one hand, and that the responsible party; otherwise every employee might, with equal effect, issue documents that would pass the title of all the goods in his employer's possession. And hence, the admissibility of the evidence to show the capacity in which Gayley was employed, and his duties therein. He was only the servant or foreman of the actual warehouseman. No one but the master can sign a bill of lading: Dean *v.* King, 22 Ohio 119; Babcock *v.* Orbison, 25 Ind. 75; Jearez *v.* Steamer George Washington, 1 Woods 96.

No one disputes that an owner cannot be defrauded of his property by the sale of it to a stranger, but it is also not to be doubted that a sale by an owner does destroy the lien of a pledgee whose pledge is unaccompanied by possession. In the former the ownership is absolute, in the latter, it is a mere lien: Walker *v.* Staples, 5 Allen 34. Delivery of the pledge, or a transfer of the custody, is absolutely essential to constitute a valid pawn: Beeman *v.* Lawton, 37 Maine 543; Owens *v.* Kinsey, 7 Jones L. (N. C.) 245; Smyth *v.* Craig, 3 W. & S. 14.

[Peoples' Bank *v.* Gayley.]

The contract of Gayley with Morris, if there was one, was incapable of transfer so as to entitle the transferee to sue in his own name: Thompson *v.* Dominy, 14 Mees. & Wells. 403; Fahncstock *v.* Schoyer, 9 Watts 102; London Savings Society *v.* Hagerstown Bank, 12 Casey 498; McCormick *v.* Trotter 10 S. & R. 94.

In replevin, a defendant may defeat the action, by showing title in a third person: Robinson *v.* Colloway, 4 Ark. 94; Redman *v.* Hendrickson, 1 Sandf. (N. Y.) 32; Lester *v.* McDowell, 6 Harris 91.

Under the pleas of *non cepit* and "no property in the plaintiffs," the defendant may undoubtedly show that the plaintiffs had no right to the possession, or that the title was in a stranger: Page *v.* Weeks, 13 Mass. 199; Whitwell *v.* Wells, 24 Pick. 25; McBride *v.* Duncan, 1 Whart. 269.

Mr Justice GORDON delivered the opinion of the court, March 1st 1880.

Unless the bank has succeeded in showing that the receipts issued by Gayley, of October 15th and 20th 1874, are warehouse receipts, under the Act of 24th of September 1866, it has no case. Admitting all that Ervin swears to, it but comes to this, that Gayley was the bailee of Morris, the owner of the iron, and as Morris, through Ervin, sold or pledged the iron for value to two different parties, who were without notice of the claims of each other, it follows, that the one first obtaining the possession, or what is now under the statute its equivalent, would have the right of property: and the one failing in this, having no property in the goods claimed, could certainly not maintain the action of replevin: Winslow *v.* Leonard, 12 Harris 14; per LOWRIE, J.; Davis *v.* Bigler, 12 P. F. Smith 242.

Now, from the evidence, two things may be taken as established: 1. That Troutman had a regular warehouse receipt from Etting & Groome, the lessees of the wharf, and hence, under the statute, he had the right of property, unless the plaintiff, the pledgee of Morris, had the previous right, by virtue of the receipts from Gayley.  2. That Troutman, when he purchased, had no notice of the property to the bank.

These being the main and really important facts of the case, it follows, that very many of the numerous exceptions taken in the court below, to the rejection or admission of evidence, become unimportant and need no consideration.  The real and only question for solution is, which of these parties had the prior right to this metal?  And as neither had the actual possession of this property, as that remained with the wharfinger, this question rests for its solution not upon the form but upon the character of the papers by which they severally profess to hold title.  Gayley's receipts were, in point of time, prior to those of Etting & Groome to Troutman; it follows, that if Gayley had power to issue receipts, such as are

contemplated by the statute of 1866, the plaintiff's case is made out and it ought to recover; on the other hand, if he had no such power, as against Troutman, the bank had no right in the property, and the case was properly disposed of in the court below. The question then which we have to deal with is one of power. What was Gayley's power? And here, also, we get' rid of a good deal of the brushwood of this case; for if Gayley had no power, original or delegated, to issue technical warehouse receipts, what he knew of Ervin's intentions, what Ervin said to him, or he to Ervin, was of no consequence; so, on the other hand, if Gayley had such power his intention to give a mere memorandum would not have a feather's weight in the case, for none the less would a bona fide purchaser or pledgee take title by virtue of the receipts issued by him. We proceed, then, to inquire what was the position and power of this man Gayley on and about the wharf upon which the iron in suit was found? But as to this there is no controversy. The responsible parties were Etting & Groome; they were lessees of the wharf, and Gayley was their employee. To this both Gayley and Groome swore, as well as to the further fact, that he had no authority to issue warehouse receipts. Furthermore, Mr. Morris, himself, testifies: " I knew Gayley as a weighmaster, did not know him as a warehouseman." That Ervin himself knew of this fact is patent; for that, when he intended to repledge this iron to the Philadelphia Warehouse Company, he went to Etting & Groome for his receipts.

Such, then, being the undisputed status of affairs, with whom, in the language of the Act of Assembly, were the goods in controversy "stored or deposited ?" Upon the determination of this question depends the validity of the plaintiffs' receipts. Were they stored or deposited with Etting & Groome or with Gayley? This question would seem to be very clearly settled by the preceding facts. If Etting & Groome were the owners of the wharf, if Gayley was but a servant in charge of this wharf, he was but a custodian for his masters, and goods deposited on that wharf were deposited with them and not with him. It is urged that the Malins sent the order for the iron sold to Morris in an envelope addressed to Gayley. But what of that? This metal had been stored there before the date of the order, and without the assent of Etting & Groome, Gayley could not remove it nor permit it to be removed. Moreover, it was " subject to the payment of freight and charges thereon," not to Gayley, but to his employers. It is true he had possession, inasmuch as he had charge of the wharf, but his possession, like that of any other servant in charge of his master's property, was subordinate to that of Etting & Groome. In other words, he had possession for them; his possession was but their possession. He was an agent with limited powers, and those dealing with him were bound to inquire as to the extent of those

[Peoples' Bank *v.* Gayley.]

powers, or take the risk upon themselves : Moore's Exr's *v.* Patterson, 4 Casey 505. Suppose they, as they had the undoubted power to do, had discharged him the next day, or the next hour, after he had received the order from the Malin brothers ? Who then would have had possession of the iron, and who would have been responsible for its safe-keeping ? Surely, Etting & Groome, not Gayley. Thus it is that we discover, beyond peradventure, with whom the commodity in question was stored or deposited, and it is thus that we determine who is the " warehouseman, wharfinger or other person," who by the act is empowered to give the statutory receipt.

If, indeed, any servant could bind his master by issuing a receipt for goods committed to his charge, the condition of things would be sufficiently serious, and the statute would be pregnant with more harm than good. In this very case we have an example of what would result from such a construction of the act. A crafty agent obtains a receipt from a servant, intended only as a memorandum, pledges it to an innocent party, then obtains another receipt from the owners of the wharf, and passes that to a like innocent party, and thereby these wharfingers are liable for double the value of the property. But we may easily suppose a case in which a dishonest clerk or other employee, in connection with one or more accomplices, might, in a month's time, bring to ruin the wealthiest warehouseman in this city. But this will not do ; such results were never intended by the makers of the statute, and a construction such as this is warranted neither by the letter nor spirit of that statute.

Judgment affirmed.